**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

STEPHEN SUMMERS,

      Plaintiff,

                                Civil Action 2:15-cv-2980

vs.

                                **JUDGE JAMES L. GRAHAM,**
                                **Magistrate Judge Kimberly A. Jolson**

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Stephen Summers, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits ("DIB") and supplemental security income ("SSI"). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.  FACTUAL AND MEDICAL BACKGROUND

Plaintiff filed his applications for benefits on January 28, 2013, alleging disability since January 6, 2013, due to bipolar disorder and a stroke. (Tr. 216–17, 242, PAGEID #244–45, 271). After initial administrative denials of Plaintiff's claims, an Administrative Law Judge ("the ALJ") held a hearing. On March 21, 2014, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 15–29, PAGEID #40–54).

1

On September 17, 2015, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (Tr. 1-3, PAGEID #26–28).  Plaintiff then filed this action.

### A.  Plaintiff's Testimony at the Administrative Hearing

Plaintiff was 50 years old at the time of the administrative hearing.  (Tr. 42, PAGEID #67).  He has a high school education and some college but described his reading and writing as "poor" due to his eyesight and further testified that his "gears are not turning the way they used to."  (Tr. 43, PAGEID #68).  He has no permanent residence and was residing in transitional housing at the time of the hearing.   (Tr. 44–45, PAGEID #69-70).  Plaintiff testified that, during a typical day, he walks about three miles to the Alcoholics Anonymous recovery center, visits with friends, and spends the remainder of the day sleeping.  (Tr. 47, PAGEID #72 –74).  Plaintiff also testified that he quit drinking alcohol the day of his stroke.  (Tr. 51, PAGEID #76).

At the time of the hearing, Plaintiff's treatment for his stroke was ongoing, including a Lipitor and aspirin regimen.  (Tr. 65, PAGEID #90–91).  Plaintiff testified that due to his stroke, he cannot do math problems, cannot count change, and has problems pronouncing words.  As to his physical impairments, he testified that:  He hears a ringing in his left ear; his left hand and arm cannot grip; he struggles to pick up coins; and has periodic numbness in his left leg and tingly toes.  (Tr. 66-70, PAGEID #91–95).  Plaintiff estimated that he can stand for 20 minutes; walk for 30 minutes and then stop and rest for three minutes; and sit for 45 minutes.  (Tr. 72, PAGEID #97–98).

As to his mental impairments, Plaintiff testified that he has been diagnosed with bipolar disorder with schizo tendencies and homicidal ideation.  He has tried to harm himself three

2

times, has homicidal thoughts, and feels claustrophobic at times.  (Tr. 74, PAGEID #99–101).

He takes medication for both bipolar disorder and depression—the medications fatigue him.  (Tr. 76, PAGEID #101).

Plaintiff also discussed his work history.  Specifically, he testified that following his stroke, he tried to return to work at a job stacking molds in boxes.  His employment lasted for only a few days because he was fired for moving too slowly.  (Tr. 59-61, PAGEID #84–86).

### B.  Vocational Expert Testimony

The vocational expert ("VE") testified at the administrative hearing that Plaintiff's past jobs include a truck driver, industrial truck operator, and insulation supervisor (all at the medium exertion, semi-skilled level); and a stock clerk (at the heavy, semi-skilled position).  (Tr. 82, PAGEID #107).

The ALJ proposed a series of hypotheticals regarding Plaintiff's residual functional capacity ("RFC") to the VE.  (Tr. 82-84, PAGEID #107–09).  Based on Plaintiff's age, education, and work experience—and the RFC ultimately determined by the ALJ, the VE testified that the hypothetical individual could not perform Plaintiff's past work but could perform light exertion, unskilled jobs in the national economy such as a housekeeper/cleaner, a marker, and a router.  (*Id.*).  If the individual were limited to lifting frequently 15 lbs. and occasionally 10 lbs., with no kneeling or crawling, the VE confirmed that it would not impact any of the jobs that she cited.  (Tr. 85, PAGEID #110).  The VE further testified that exceeding the customary break tolerances on an ordinary and regular basis or having to be redirected up to 33% of the workday would eliminate the jobs that she cited.  (Tr. 85–86, PAGEID #110–11).

3

C. **Relevant Medical Evidence**

    1.    **Physical Impairments**

        a.    **Riverside Methodist Hospital**

Plaintiff presented to the Riverside Methodist Hospital emergency room with left side weakness on January 6, 2013. (Tr. 285-324, PAGEID #315–54). A Brain CT showed a partially occlusive thrombus at M1 segment (the part of the middle cerebral artery from the internal carotid artery to the lateral fissure) of the right MCA (middle cerebral artery) moderately sized focus of acute infarction at the right parietal, questionable petechial hemorrhage with areas of infarct, delayed time to peak in the right MCA territory distribution with matched perfusion defect within the area of infarction as visualized on a non-contrast head CT. (Tr. 320-21, PAGEID #350–51). Plaintiff was admitted to the neuro critical care unit for observation because he was at a high risk for hemorrhage. (Tr. 298, PAGEID #338). An MRI of Plaintiff's brain showed an acute to subacute infarct in the right middle cerebral artery distribution with petechial hemorrhage, parietal temporal lobe infarct with questionable petechial hemorrhage. (Tr. 293, PAGEID #323). An MR Angiography of the neck revealed no carotid stenosis but possible mild to moderate stenosis at the origin of the left vertebral artery. (Tr. 323–24, PAGEID #353–54). Finally, a Transesophageal Echocardiogram showed left ventricular ejection fraction of 55-60% with no significant valvular abnormality. (Tr. 317–19, PAGEID #347–49). While inpatient, Jennifer Mejilla, M.D., evaluated Plaintiff and diagnosed acute stroke, cerebral infarction. (Tr. 289–92, PAGEID #319–22).

Upon discharge on January 8, 2013, it was determined that Plaintiff had a "good"

recovery after the stroke, with some possible visual field loss.  (Tr. 293–96, PAGEID #323–26).
Plaintiff then underwent occupational therapy from January 17, 2013, through February 5, 2013.
(Tr. 325–44, PAGEID #355–74).  Upon discharge from therapy, all goals were met:  Plaintiff
had returned to full independence even though he had not yet been released to drive due to vision
problems.  (Tr. 337–38, PAGEID #367–68).

On February 18, 2013, Plaintiff returned to Dr. Mejilla.  (Tr. 347–51, PAGEID #377–81).
She noted that, as of that date, Plaintiff had been unable to return to work, and his visual field
deficit had left him significantly impaired and unable to drive.  (Tr. 347, PAGEID # 377).
Additional history following his hospitalization included Plaintiff's sister reporting that prior to
his stroke, Plaintiff drank pints of whisky on a daily basis and that he had mood swings.  (*Id.*).
Dr. Mejilla examined Plaintiff and found he was alert and oriented x4; his speech and language
were normal without aphasia; his memory to both recent and remote was intact; his concentration
was slightly decreased; he was easily distracted, but easily redirected; and had a flat affect on
occasion.   His visual fields were decreased on the left with very noticeable left inferior
quadrantanopia.  Plaintiff's sensation was intact throughout.  Plaintiff exhibited full motor
strength; no tremors; reflexes 1 + throughout; normal coordination; normal gait; could perform
heel to toe walking without difficulty.  At this appointment, Plaintiff reported that his main
issues were not truly medical—he was concerned about his finances.  (Tr. 348, PAGEID #378).
In her report, Dr. Mejilla also noted that her questioning agitated Plaintiff, especially questions
about drinking.  (Tr. 349, PAGEID #379).

### b.    Kathleen McGowan, M.D.

Consulting ophthalmologist, Dr. McGowan, examined Plaintiff on April 18, 2013, on behalf of the state agency.  (Tr. 365–67, PAGEID #395–97).  Dr. McGowan concluded that Plaintiff was able to drive, read small print, and perform his activities of daily living.  (Tr. 366, PAGEID #396).

### c.    Jacquelyn Tom, PT

Plaintiff underwent a functional capacity evaluation with Ms. Tom, a physical therapist on October 7, 2013.  (Tr. 368–72, PAGEID #398–402).  To Ms. Tom, Plaintiff reported that he was homeless but "stay[s] at his girlfriend's where he sleeps in the back of his truck."  (Tr. 369, PAGEID #399).  On examination, Plaintiff's gait was slow and guarded; he had loss of range of motion of the cervical and lumbar spine; 4/5 weakness of the hips and knees; and his straight leg raising in the supine position was bilaterally positive.  (Tr. 370, PAGEID #400).  Ms. Tom opined that based on Plaintiff's lifting and carrying, he was functioning at a sedentary physical demand level.  And, based on his aerobic capacity, he was functioning at a light physical demand level.  During the examination, Plaintiff had difficulty with most nonmaterial handling activities and was currently functioning at the sedentary level where he could carry up to 15 pounds infrequently and lift 10 pounds infrequently, and was further limited with static standing and sitting secondary due to low back and left leg pain.  (Tr. 372, PAGEID #402).

### d.    Muskingum Valley Health Care

Plaintiff began treatment at Muskingum Valley Health Care for primary care in July 2013.  (Tr. 388–90, PAGEID #418–20).  At that time, Plaintiff's review of systems was negative; and he exhibited pain at his lumbar spine but had a normal range of motion with no tenderness or

6

swelling.  (Tr. 388, PAGEID #418).  Plaintiff was assessed with a renal cyst, Bipolar Affective Disorder, depression, fatigue, disk herniation, and degenerative disk disease.  (Tr. 389, PAGEID #419).

When seen in September 2013, Plaintiff complained of chronic back and bilateral knee pain.  On examination, Plaintiff had full range of motion of the knees.  The nurse practitioner recommended Tramadol (an opioid pain medication).  (Tr. 393–94, PAGEID #423–24).  An MRI showed disc herniation at L5-S1 with foraminal stenosis at L3-4 due to mild disk bulge and degenerative changes.  (Tr. 406, PAGEID #436).  When seen in January 2014 to check his cholesterol, the nurse practitioner recorded normal examination findings and prescribed Chantix (a smoking-cessation aid).  (Tr. 497–98, PAGEID #527–28).

### e.    William W. Chang, M.D.

Plaintiff consulted with Dr. Chang, a physiatrist, on February 5, 2014.  (Tr. 507–17, PAGEID #537–47).  Plaintiff's complaints included neck pain, lower back pain radiating to the right lower extremity foot level, and left lower extremity thigh level.  (Tr. 512, PAGEID #542).  Dr. Chang examined Plaintiff and found no atrophy or muscle spasms of either the upper or lower extremities.  Plaintiff's lumbar spine was tender with mild limitation of motion.  Straight leg raising was negative, and sensation was intact except for reduced sensation of the left dorsal foot.  Muscle strength was 5/5 in all extremities, reflexes were present and equal.  Plaintiff's gait was normal.  (*Id.*)

Dr. Chang diagnosed Plaintiff with chronic persistent lower back pain with bilateral lower extremities, sciatic radicular neuropathic pain after lumbar sprain, and muscular strain secondary to lumbar spine foramina and central canal stenosis secondary to L4-5, L5-Sl disk

building and L5-Sl disk herniation with spondylosis and facet arthropathy; leg length discrepancy, complicated by lumbar spine decondition with spine stabilizing muscle weakness and chronic pain disorder, chronic neck pain after cervical sprains and muscle sprain probably due to cervical spondylosis, leg length discrepancy with possible left lower extremity shorter; insomnia, chronic pain disorder through central sensitization and mild bilateral shoulder contracture. (Tr. 514, PAGEID #544).

### f.     State Agency Evaluation

Leigh Thomas, M.D., a state agency physician, reviewed Plaintiff's records on June 26, 2013, and determined that Plaintiff could perform medium-exertion work. (Tr. 141–43, PAGEID #167–69).

### 2.     Mental Impairments

### a.     Six County, Inc.

Prior to his onset date of disability, Plaintiff received mental health services at Six County, Inc. from October 2005 through October 2008. (Tr. 444–46, 449–68, PAGEID #474–76, 479–98). During that time, he was diagnosed with a Mood Disorder Not Otherwise Specified ("NOS"), Social Phobia, and ADHD, predominantly inattentive type, and Bipolar Disorder. (*Id.*). Plaintiff was seen again on November 26, 2013, and was diagnosed with Mood Disorder NOS, and Personality Disorder NOS. (Tr. 435–43, PAGEID #465–73).

### b.     Family Care Behavioral Health Services

Plaintiff sought mental health treatment at Family Care Behavioral Health Services on June 21, 2012. (Tr. 382–83, PAGEID #412–13). Plaintiff was diagnosed with a mood disorder,

NOS, and assigned a Global Assessment of Functioning ("GAF") score of 52. He was prescribed Abilify (a mood-disorder drug). (*Id.*).

### c. Mark D. Hammerly, Ph.D.

Dr. Hammerly, a licensed psychologist, evaluated Plaintiff on April 15, 2013, for disability purposes. (Tr. 352–63, PAGEID # 382–93). Dr. Hammerly noted that Plaintiff's eye contact was moderate. Speech was clear and 100 percent understandable with normal rate and tone. His thought processes were coherent, goal-directed, and logical. Plaintiff's mood was found to be downcast, and his affect was constricted. Plaintiff was able to recall five digits forward and five in reverse. He was also able to perform arithmetic tasks, and concentration and memory were grossly intact. (Tr. 356–57, PAGEID #386–87). Dr. Hammerly estimated Plaintiff's level of academic knowledge to be in the low average range. I.Q. testing resulted in a verbal comprehension score of 93, a perceptual reasoning of 88, a Working Memory of 86, a Processing Speed of 68, and a Full Scale I.Q. of 81. (Tr. 358, PAGEID #388). Dr. Hammerly opined Plaintiff fell in the borderline range of intellectual functioning and that Plaintiff displayed a significant deficit in processing speed. (*Id.*). Dr. Hammerly diagnosed Plaintiff with bipolar disorder, cognitive disorder, and borderline intellectual functioning. (Tr. 357, PAGEID #387). Dr. Hammerly ultimately concluded that Plaintiff would have problems with understanding, remembering and carrying out instructions consistent with borderline intelligence; would have difficulty interacting with others; and would have decreased effectiveness when subjected to ordinary workplace pressures. (Tr. 360–61, PAGEID #390–91).

### d.    State Agency Evaluation

On July 1, 2013, after review of Plaintiff's medical record upon reconsideration, Cynthia Waggoner, Psy.D., a state agency psychologist, assessed Plaintiff's mental condition and opined that Plaintiff had moderate restrictions in his activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; and no episodes of decompensation of an extended duration. (Tr. 139, PAGEID #165). She gave only partial weight to Dr. Hammerly's assessment because it was "too vague." (Tr. 140, PAGEID #166). Dr. Waggoner opined that Plaintiff could understand, remember, and carry out simple one- to two-step tasks; had adequate concentration/attention for simple one- to two-step tasks; had low stress tolerance; could perform routine tasks with superficial interaction with the general public, but would do best in a non-public work setting; and needed to work in an environment that was static and required only routine changes in work setting. (Tr. 143–45, PAGEID #169–71).

### D.  The Administrative Decision

On March 21, 2014, the ALJ issued an unfavorable decision. (Tr. 15–29, PAGEID #40–54). The ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of January 6, 2013. (Tr. 17, PAGEID #42). The ALJ determined that Plaintiff had the following severe impairments: cerebral vascular accident (CVA); degenerative disc disease; bipolar disorder; mood disorder; cognitive disorder; and borderline intellectual functioning. (Tr. 18, PAGEID #43). The ALJ found that he did not, however, meet the requirements of an impairment listed in 20 CFR Subpart P, Appendix 1. (Tr. 20, PAGEID #45). The ALJ ultimately found that Plaintiff had the RFC to perform light work, except: frequently

10

climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling; no climbing ladders/ropes/scaffolds; avoiding all hazards such as unprotected heights, hazardous machinery, and commercial driving; and limited from occupations requiring peripheral acuity.  (Tr. 22, PAGEID #47).

The ALJ further found that Plaintiff could understand, remember, and carry out simple instructions where the pace of productivity is not dictated by an external source over which the individual has no control, such as an assembly line or conveyor belt—there can be no strict production quotas.  Plaintiff could make judgments on simple work and respond appropriately to usual work situations and changes in a routine work setting that is repetitive from day-to-day with few and expected changes.  Plaintiff could respond appropriately to supervision and have occasional interaction with co-workers but only rare (not precluded but less than occasional) contact with the general public and no work in teams or tandem with co-workers.  (*Id.*).

Relying on the VE's testimony, the ALJ concluded that even though Plaintiff cannot perform his past relevant work, he can perform jobs that exist in significant numbers in the national economy.  (Tr. 26–28, PAGEID #51–53).  The ALJ ultimately concluded that Plaintiff was not disabled under the Social Security Act.  (Tr. 28–29, PAGEID #53–54).

## II.  STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *Canty v. Comm'r of Soc. Sec.*, 2016 U.S. Dist. LEXIS 142761 *3–4 (S.D. Ohio Oct. 14, 2016) (quoting *TNS, Inc. v. Nat'l Labor Relations Bd.*, 296 F.3d 384, 395 (6th Cir. 2002)).

## III. DISCUSSION

Though Plaintiff assigned four errors (Doc. 10 at PageID #553), his arguments fall into two categories. First, he challenges the ALJ's RFC determination. (Doc. 10 at PageID #563). And, second, he asserts that the ALJ erred in the questions he asked to the VE based upon his RFC finding. Both arguments lack merit.

### A. RFC Determination

Plaintiff challenges the ALJ's RFC determination. A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). To assist in RFC determinations, the Commissioner considers physical exertional requirements and "classif[ies] jobs as sedentary, light, medium, heavy, and very heavy." 20 C.F.R. §§ 404.167, 416.967. The regulations describe light work:

12

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. §§ 404.167(b), 416.967(b) (emphasis added). The ALJ, not a physician, ultimately determines a claimant's RFC. 42 U.S.C. § 423(d)(5)(B). *See also Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984).

As noted above, the ALJ found Plaintiff capable of light work with additional environmental and postural restrictions, citing 20 C.F.R. §§ 404.1567(b) and 416.967(b). (Tr. 22, PAGEID # 47). Here, the ALJ based the RFC determination upon the medical opinion evidence of record, the results of objective clinical testing, Plaintiff's treatment history, and his daily activities. Notably, none of Plaintiff's treating physicians opined he is completely disabled. In absence of any such treating physician opinion, the ALJ weighed the two physicians' assessments who opined as to Plaintiff's physical limitations, Drs. McGowan and Mejilla. Dr. McGowan, the consulting ophthalmologist, opined that Plaintiff is able to drive, read small print, and perform daily functions. (Tr. 22, PAGEID #47, citing to Tr. 366, PAGEID #396). Moreover, the ALJ relied on the opinion of Dr. Mejilla, an examining neurologist, who found that Plaintiff's only limitation one month after his stroke was an inability to drive due to impaired vision. (Tr. 22, PAGEID #47 (citing Tr. 347, PAGEID # 377)).

Plaintiff challenges the ALJ's physical RFC analysis by arguing that the ALJ gave improper weight to the opinion from Jacquelyn Tom, a physical therapist who performed a

functional capacity evaluation of Plaintiff under Social Security Regulation ("SSR") 06-3p. (Doc. #10, PAGEID #565-66).  Under the regulations, a physical therapist is not an "acceptable medical source" as defined by 20 C.F.R. § 404.1513(a)(1)-(5).  SSR 06-03p essentially provides that while the factors set forth in 20 C.F.R. § 404.1527(d) apply only to evaluating medical opinions from acceptable medical sources, the same factors can be applied to opinion evidence from other sources.  Further, Ruling 06–03p "notes that information from 'other sources' cannot establish the existence of a medically determinable impairment, [but] the information 'may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.'"  *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (quoting SSR 06–03p, 2006 SSR LEXIS 4, 2006 WL 2329939 (S.S.A.)).  Factors that apply to an ALJ's consideration of opinions by non-acceptable medical sources, when they have seen the claimant in their professional capacity, include "how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Id.* (citing *Martin v. Barnhart*, 470 F.Supp.2d 1324, 1328–29 (D. Utah 2006)).

The ALJ's decision confirms his consideration of the aforementioned regulations.  In particular, the ALJ noted that he "[could not] give controlling weight to Ms. Tom's opinion as physical therapists are not considered medical sources (20 CFR 404.1513 and 416.913), and her statement regarding standing and sitting is too vague.  However, Ms. Tom's opinion regarding lifting is quite close to light work and thus can be given some consideration on that basis."  (Tr. 23, PAGEID #48).  The Court thus finds the weight accorded to Ms. Tom's opinion to be supported by substantial evidence, and the ALJ's consideration of her opinion complies with Social Security regulations.  Moreover, Ms. Tom's examination findings were generally normal.

14

Specifically, Ms. Tom's findings did not support loss of manipulation or grasp, except with driving. (Tr. 18-20, PAGEID #43–45, citing to Tr. 366, PAGEID #396, 347, PAGEID #377). In addition, when the ALJ asked the VE if Plaintiff were limited to lifting frequently 15 lbs. and occasionally 10 lbs., with no kneeling or crawling, the VE confirmed that it would not impact any of the Step 5 jobs that Plaintiff could perform. (Tr. 85, PAGEID #110).

Plaintiff also challenges the ALJ's mental RFC determination. In particular, Plaintiff argues that the ALJ failed to account for Dr. Hammerly's opinion regarding Plaintiff's ability to deal with the public or respond to ordinary workplace pressures. (Doc. #10, PAGEID #564–65). The record shows otherwise. In assessing Plaintiff's mental abilities, the ALJ found Plaintiff could perform a range of work that accommodated a variety of mental limits. (Tr. 22 PAGEID #47). For this determination, the ALJ relied heavily upon the opinion of Dr. Waggoner, a state agency reviewing psychologist. Dr. Waggoner opined that Plaintiff could understand, remember, and carry out simple one- to two-step tasks; had adequate concentration/attention for simple one- to two-step tasks; had low stress tolerance; could perform routine tasks with superficial interaction with the general public, but would do best in a non-public work setting; and needed an environment that was static and required only routine changes in work setting.

With one exception, the ALJ accepted Dr. Waggoner's opinion. (Tr. 23, PAGEID #48). The ALJ considered that, although Dr. Waggoner indicated that Plaintiff would do best in a non-public work setting, the record evidence demonstrated that Plaintiff was able to relate to people in a positive manner. (*Id.*) Specifically, the ALJ considered that Plaintiff had a girlfriend and other friends; in February 2014, he lived with a roommate; and he related adequately and pleasantly to medical and non-medical sources. (Tr. 20–23, PAGEID #45–48). The ALJ thus

15

decided that Plaintiff could relate to the general public but only on a rare basis.  (Tr. 22-23).

Accordingly, to the extent supported, the ALJ gave reasonable weight to Dr. Waggoner's

opinion.  This reliance was proper.  *See* 20 C.F.R. § 404.1527(2)(2)(i) ("State agency medical

and psychological consultants and other program physicians, psychologists, and other medical

specialists are highly qualified physicians, psychologists, and other medical specialists who are

also experts in Social Security disability evaluation."); *see also Combs v. Comm'r of Soc. Sec*.,

459 F.3d 640, 651-52 (6th Cir. 2006) (en banc) (holding that an ALJ could rely upon the opinion

of a reviewing physician).

The ALJ also assigned "significant weight" to the opinion of Dr. Hammerly, which the

ALJ found was "generally consistent with the opinion of [Dr. Waggoner]."  (*Id.*).  In April 2013,

Dr. Hammerly diagnosed Plaintiff with bipolar disorder, cognitive disorder, and borderline

intellectual functioning.  (Tr. 357, PAGEID #387).  Based on these diagnoses, Dr. Hammerly

concluded that Plaintiff would have problems with understanding, remembering and carrying out

instructions consistent with borderline intelligence; would have difficulty interacting with others;

and would have decreased effectiveness when subjected to ordinary workplace pressures.  (Tr.

360-61, PAGEID #390-91).

Plaintiff contends that the ALJ's mental RFC did not account for Dr. Hammerly's

opinion regarding Plaintiff's ability to deal with the public or respond to ordinary workplace

pressures.  (Doc. #10, PAGEID #564-65).   However, as discussed above, the ALJ explained

why he concluded that Plaintiff could relate to the general public on a rare basis.  (*See* Tr. 23,

PAGEID #48).  Further, the ALJ's RFC included the following limitations: only simple work

where pace of productivity would not be dictated by an external source; a job with no strict

production quotas; a job with usual work situations and changes in a routine work setting that repeated from day-to-day with few and expected changes.  (*Id.*).  Those limitations reasonably accounted for Dr. Hammerly's opinion that Plaintiff would have decreased effectiveness when subjected to ordinary workplace pressure.  Moreover, as discussed, Dr. Waggoner considered Dr. Hammerly's opinion along with the other evidence before her and gave restrictions, which the ALJ generally accepted.

In sum, substantial evidence supports the ALJ's RFC determination.  It is not this Court's role to sift through the facts and make a *de novo* determination of whether a claimant is disabled.  The ALJ, not the Court, is the finder of fact.  *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). The ALJ reasonably undertook that role here.  *Id.*  Because substantial evidence supports the decision below, it must be affirmed.

### B.  Hypothetical Questions

In addition, the Court finds the ALJ committed no error at Step Five.  Plaintiff's argument—that the hypothetical posed to the vocational expert did not include all of his Limitations—lacks merit.  An ALJ may properly pose to the VE a hypothetical reflective of the ALJ's actual findings, to the extent that those findings are supported by substantial evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003).  The VE was competent to testify that there were a number of positions which Plaintiff could perform based upon the RFC provided by the ALJ.  Whereas the Court concluded *supra* that the ALJ's RFC determination is supported by substantial evidence, the hypothetical questions posed by the ALJ, which incorporated such assessment, were not improper.  *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

17

## IV.    RECOMMENDED DISPOSITION

For the reasons stated, it is **RECOMMENDED** that the Plaintiff's statement of errors be **OVERRULED** and that judgment be entered in favor of Defendant.

## V.    PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date:   November 14, 2016                                /s/ Kimberly A. Jolson
                                                        KIMBERLY A. JOLSON
                                                        UNITED STATES MAGISTRATE JUDGE